## UNITED STATES DISTRICT COURT
## DISTRICT OF DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMON CAUSE, CITY OF ATLANTA, CITY OF PATERSON, PARTNERSHIP FOR THE ADVANCEMENT OF NEW AMERICANS, ROBERTO AGUIRRE, SHEILA AGUIRRE, PAULA AGUIRRE, ANDREA M. ALEXANDER, DEBRA DE OLIVEIRA, SARA PAVON, JONATHAN ALLAN REISS, and MYRNA YOUNG,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States,<br><br>UNITED STATES DEPARTMENT OF COMMERCE,<br><br>WILBUR L. ROSS, JR., in his official capacity as Secretary of Commerce,<br><br>CHERYL L. JOHNSON, in her official capacity as the Clerk of the United States House of Representatives,<br><br>Defendants. | Case No. _____<br><br><br><br><br><br><br><br><br><br>**COMPLAINT** |

## INTRODUCTION

1.     This is a complaint for declaratory judgment and injunctive relief against implementation of the Memorandum issued by President Donald J. Trump on July 21, 2020, titled "Excluding Illegal Aliens From the Apportionment Base Following the 2020 Census" (the "Memorandum"), on the grounds that the Memorandum violates Article I, § 2 of the U.S. Constitution as amended by § 2 of the Fourteenth Amendment; the Equal Protection guarantees of the Fifth and Fourteenth Amendments; and 2 U.S.C. § 2a(a) and 13 U.S.C. § 141.

2.      The Memorandum purports to break with almost 250 years of past practice by excluding undocumented immigrants when calculating the number of seats to which each State is entitled in the House of Representatives.   This new policy flouts the Constitution's plain language, which states that "[r]epresentatives shall be apportioned among the several states according to their respective numbers, counting **the whole number of persons in each state**," excluding only "Indians not taxed."   U.S. Const., amend. XIV, § 2 (emphasis added).   It also flies in the face of the statutory scheme governing apportionment, which requires the President to include "the **whole number of persons in each State**" in the apportionment base—again, excluding only "Indians not taxed."  2 U.S.C. § 2a(a) (emphasis added).

3.      Since the founding, the three branches of government have agreed that "the whole number of persons in each state" includes non-citizens, whether documented or undocumented. Now, for the first time in our nation's history, the President has purported to declare the opposite.  As the Department of Justice observed in 1980, such a change would be "a radical revision of the constitutionally mandated system for allocation of Representatives to the States of the Union and an equally radical revision of the historic mission of the decennial census."

4.       President Trump's Memorandum is not an isolated event.   Rather, it is the culmination of a concerted effort, stretching back at least five years, to shift the apportionment base from *total* population to *citizen* population—a strategy intended, in the words of its chief architect, to enhance the political power of "Republicans and non-Hispanic whites" at the expense of people of color, chiefly Latinos.  The Memorandum is, in this respect, consistent with the Administration's attempt to add a citizenship question to the 2020 census—a ploy that the U.S. Supreme Court rejected as pretextual and unlawful.  The Administration's latest effort should meet the same end.

5.     Plaintiffs bring this action for declaratory and injunctive relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201(a) to halt Defendants' violations of the Constitution and laws of the United States and to protect the right of all of this country's inhabitants to the equal protection of its laws.

## JURISDICTION AND VENUE

6.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, because this action arises under the Constitution and laws of the United States, and relief is authorized under 42 U.S.C. § 1983 and 28 U.S.C. § 2201(a).

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Defendants are United States agencies or officers acting in their official capacities or under color of legal authority, and Defendants reside in this District, or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, or one or more Plaintiffs resides in this District.

8.     This Court has personal jurisdiction over Defendants because Defendants are located within this District and Defendants' actions and omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

9.     Plaintiff Common Cause is a nonprofit organization organized and existing under the laws of the District of Columbia, with its principal place of business in the District of Columbia.  Common Cause is a nonpartisan democracy organization with over 1.2 million members, 22 state offices, and a presence in all 50 states.  It has members in all 50 states and in every congressional district.  Since its founding by John Gardner fifty years ago, Common Cause

has been dedicated to making government at all levels more representative, open, and responsive to the interests of ordinary people.  It sues herein on behalf of its members.

10.     Plaintiff City of Atlanta is the capital and most populous city in the State of Georgia, with a population of over half a million people.  People of color constitute the majority of its population.  It has a notably large population of immigrants, including Latino immigrants, as well as immigrants from East and South Asia, Africa, and the Caribbean.

11.     Plaintiff City of Paterson is the county seat of Passaic County, New Jersey, with a population of approximately 150,000 people.  It has a notably large population of immigrants, including Latino immigrants, as well as immigrants from Bangladesh, India, South Asia, and the Arab and Muslim world.

12.     Plaintiff Partnership for the Advancement of New Americans (PANA) is a 501(c)(3) nonprofit based in San Diego, California with over 400 members.  PANA is dedicated to advancing the full economic, social, and civic inclusion of refugees. It advocates for public policy solutions that will ensure local governments invest in the long-term economic self-sufficiency of newcomers and refugee families, including effective resettlement strategies and equitable allocation of federal resources. PANA provides support to communities directly affected by unjust immigration policies, including nationals from Iran, Libya, Somalia, Sudan, Syria and Yemen who have resettled and continue to seek refuge in the San Diego region.  In addition to its public policy advocacy, PANA engages more than 40,000 former refugee, African immigrant, Muslim, and Southeast Asian voters in elections throughout the San Diego region to ensure the fair representation of these historically underrepresented communities.  It sues herein both on its own behalf and on behalf of its members.

13.     Plaintiff Roberto Aguirre is a naturalized U.S. citizen and a resident of Queens, New York City, New York.  He is of Latino ethnicity and Ecuadorean national origin.  He is a registered voter and regularly exercises his right to vote.

14.     Plaintiff Sheila Aguirre is a natural-born U.S. citizen and a resident of Queens, New York City, New York.  She is of Latina ethnicity and Ecuadorean heritage.  She is a registered voter and regularly exercises her right to vote.

15.     Plaintiff Paula Aguirre is a natural-born U.S. citizen and a resident of Queens, New York City, New York.  She is of Latina ethnicity and Ecuadorean heritage.  She is a registered voter and regularly exercises her right to vote.

16.     Plaintiff Andrea M. Alexander is a natural-born citizen and a resident of Brooklyn, New York City, New York.  Her racial identity is Black.  She is a registered voter and regularly exercises her right to vote.

17.     Plaintiff Debra de Oliveira is a naturalized U.S. citizen and a resident of Margate, Florida.  Her racial identity is Black and her national origin is Guyanese.  She is a registered voter and regularly exercises her right to vote.

18.     Plaintiff Sara Pavon is a naturalized U.S. citizen and a resident of Queens, New York City, New York.  She is of Latina ethnicity and Ecuadorean national origin.  She is a registered voter and regularly exercises her right to vote.

19.     Plaintiff Jonathan Allan Reiss is a naturalized U.S. citizen and a resident of Manhattan, New York City, New York.  He is of Caucasian ethnicity and Canadian national origin.  He is a registered voter and regularly exercises his right to vote.

20.     Plaintiff Myrna Young is a naturalized U.S. citizen and a resident of Fort Myers, Florida.  Her racial identity is Black and her national origin is Guyanese.  She is a registered voter and regularly exercises her right to vote.

21.     Defendant Donald J. Trump is the current President of the United States of America.  He is sued herein in his official capacity.  Pursuant to statute, the President is responsible for transmitting the results of the decennial census, and the resulting congressional apportionment figures, to Congress.

22.     Defendant United States Department of Commerce is a cabinet agency within the executive branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).  Pursuant to statute, the Commerce Department is responsible for, among other things, implementing and administering the decennial census and transmitting the resulting tabulations to the President for further transmittal to Congress.

23.     Defendant Wilbur L. Ross, Jr., is the Secretary of Commerce of the United States and a member of the President's Cabinet.  He is responsible for conducting the decennial census and oversees the Census Bureau.  He is sued herein in his official capacity.

24.     Defendant Cheryl L. Johnson is the Clerk of the United States House of Representatives.  Pursuant to statute, she is responsible for "send[ing] to the executive of each State a certificate of the number of Representatives to which such State is entitled" following a decennial reapportionment. 2 U.S.C. § 2a(b).  She is sued herein in her official capacity.

## FACTUAL ALLEGATIONS

**A.     Statutory Law Requires the President to Include All Persons in the Congressional Apportionment Base, Irrespective of Citizenship or Immigration Status**

25.     From the founding, the federal Constitution has required a decennial census (that is, an "actual Enumeration") to determine the apportionment of members of the U.S. House of

Representatives among the States.  The Constitution tasks Congress with passing legislation to "direct" the "manner" in which the census shall occur, subject to the requirements set forth in the Constitution itself.  *See* U.S. Const., art. I, § 2, cl. 3; *Franklin v. Massachusetts*, 505 U.S. 788, 791 (1992).

26.     By statute, Congress has assigned the responsibility of conducting the census to the Secretary of Commerce, and empowered the Secretary of Commerce to delegate authority for establishing procedures to conduct the census to the Census Bureau.  13 U.S.C. §§ 2, 4, 141; *Franklin*, 505 U.S. at 792.

27.     To that end, the Census Bureau sends a questionnaire to every household in the United States, to which every resident in the United States (documented or otherwise) is legally required to respond.  13 U.S.C. § 221.  The Census Bureau then counts responses from every household to determine the population count in the various states.

28.     The Census Bureau's rules state that its enumeration procedures "are guided by the constitutional and statutory mandates to count ***all residents*** of the several states," including "[c]itizens of foreign countries living in the United States."[1]

29.     Within nine months of the census date (in this case, by January 1, 2021), the Secretary of Commerce is required by statute to report to the President "the tabulation of ***total population*** by States . . . as required for the apportionment of Representatives in Congress among the several States."  13 U.S.C. § 141(b) (emphasis added).

30.     Thereafter, the President is required by statute to transmit to Congress two sets of numbers.  First, the President must provide "a statement showing the ***whole number of persons***

---

[1] U.S. Census Bureau, *Residence Criteria and Residence Situations for the 2020 Census of the United States* at 1-2 (emphasis added), *available at* https://www.census.gov/content/dam/Census/programs-surveys/decennial/2020-census/2020-Census-Residence-Criteria.pdf (last accessed July 22, 2020).

in each State, excluding Indians not taxed, as ascertained under the . . . decennial census of the population." 2 U.S.C. § 2a(a) (emphasis added).

31.     Second, based on the census count of the "whole number of persons in each State," the President must specify "the number of Representatives to which each State would be entitled under an apportionment of the then existing number of Representatives by the method known as the method of equal proportions, no State to receive less than one Member." *Id.*

32.     "Each State" shall thereupon "be entitled" to the number of representatives "shown in" the President's statement to Congress, "until the taking effect of a reapportionment under this section or subsequent statute." 2 U.S.C. § 2a(b).  It is "the duty of the Clerk of the House of Representatives, within fifteen calendar days after the receipt of [the President's] statement, to send to the executive of each State a certificate of the number of Representatives to which such State is entitled . . . ." *Id.*; *see Franklin*, 505 U.S. at 792.

33.     The governing statute does not authorize the Secretary of Commerce to transmit to the President a number ***other than*** "the whole number of persons in each State," as determined by the census.  Nor does it vest the President with discretion to base the apportionment calculation that he or she transmits to Congress on something ***other than*** "the whole number of persons in each State."

34.     Indeed, in enacting this statute, members of Congress noted repeatedly that the President's role in calculating apportionment figures is ministerial—*i.e.*, that the statute directs the President "to report 'upon a problem in mathematics . . . for which rigid specifications are provided by Congress itself, and to which there can be but one mathematical answer.'" *Franklin*, 505 U.S. at 799 (quoting S. Rep. No. 2, 71st Cong., 1st Sess. at 4-5 (1929)); *see also* S. Rep. No. 2, 71st Cong., 1st Sess. at 4 (1929) (stating that the President shall report "apportionment tables"

8

to Congress "pursuant to a purely ministerial and mathematical formula"); 71 Cong. Rec. 1858 (1929) (statement of Sen. Vandenberg) (stating that the "function served by the President [under this statute] is as purely and completely a ministerial function as any function on earth could be").

35.    The Supreme Court, too, has recognized that "the President *exercises no discretion* in calculating the numbers of Representatives," and that his or her role in the apportionment calculation is therefore "*admittedly ministerial*."   *Franklin*, 505 U.S. at 799 (emphasis added).

36.    The Executive Branch has similarly conceded the exclusively ministerial nature of the President's role in translating the census data to an apportionment determination.  *See* Reply Br. for the Federal Appellants at 24, *Franklin v. Massachusetts*, No. 91-1502 (U.S. Apr. 20, 1992), 1992 U.S. S. Ct. Briefs LEXIS 390 ("[I]t is true that the method [prescribed by 2 U.S.C. § 2a] calls for application of a set mathematical formula to the state population totals produced by the census"); Transcript of Oral Argument at 12-13, *Franklin v. Massachusetts*, No. 91-1502 (U.S. Apr. 21, 1992) (argument of Deputy Solicitor General Roberts) ("The law directs [the President] to apply, of course, a particular mathematical formula to the population figures he receives [from the Secretary of Commerce] . . . It would be unlawful [for the President] . . . just to say, 'these are the figures, they are right, but I am going to submit a different statement.'").

**B.    The Constitution Requires the President to Include All Persons in the Congressional Apportionment Base, Irrespective of Citizenship or Immigration Status**

37.    From the founding of our nation, all three branches of government have agreed that, independent of statutory law, the Constitution itself requires that the census count *all* "persons" residing in each State, irrespective of citizenship or immigration status, and that *all* such "persons" be included in the congressional apportionment base.

9

38.     As originally ratified, Article I, Section 2 of the Constitution provided that "Representatives . . . shall be apportioned among the several states which may be included within this union, according to their respective numbers, which shall be determined by adding to *the whole number of free persons*, including those bound to service for a term of years, and excluding Indians not taxed, three fifths of all other Persons [*i.e.*, slaves]" (emphasis added). This infamous "Three-Fifths Compromise" did not exclude free non-citizens, who as a matter of plain meaning are "persons," from the apportionment base.

39.     The Fourteenth Amendment was ratified following the Civil War.   That amendment eliminated the "three-fifths" clause, but otherwise "retained total population as the congressional apportionment base."   *Evenwel v. Abbott*, 136 S. Ct. 1120, 1128 (2016). Specifically, Section 2 of the Fourteenth Amendment provides that "Representatives shall be apportioned among the several states according to their respective numbers, counting *the whole number of persons in each state*, excluding Indians not taxed" (emphasis added).

40.     During the debates over the Fourteenth Amendment, Congress considered revising the apportionment formula to exclude persons ineligible to vote—a category which, Congress expressly recognized, included the "unnaturalized foreign-born."   Cong. Globe, 39th Cong., 1st Sess., 1256 (1866) (remarks of Sen. Wilson).   This proposal was soundly rejected, on the ground that "non-voting classes"—including unnaturalized immigrants—"have as vital an interest in the legislation of the country as those who actually deposit the ballot."   *Evenwel*, 136 S. Ct. at 1128 (quoting Cong. Globe, 39th Cong., 1st Sess., 141 (1866) (remarks of Rep. Blaine)).

41.     On several occasions since the Fourteenth Amendment's passage, Congress has considered measures to exclude "aliens," including undocumented immigrants, from the census count and/or apportionment base.   "[I]t appears to have been generally accepted that such a result

10

would require a constitutional amendment." *Fed. For Am. Immigration Reform (FAIR) v. Klutznick*, 486 F. Supp. 564, 576-77 (D.D.C.) (three-judge court), *appeal dismissed*, 447 U.S. 916 (1980).

42.     In 1929, for example, the Senate Legislative Counsel concluded that, absent such an amendment, "statutory exclusion of aliens from the apportionment base would be unconstitutional." *Id.* (citing 71 Cong. Rec. 1821 (1929)).

43.     Again in 1940, Congress considered whether "aliens who are in this country in violation of law have the right to be counted and represented." *Id.* (quoting 86 Cong. Rec. 4372 (1940)).  Representative Celler of New York explained:

> The Constitution says that all persons shall be counted. I cannot quarrel with the founding fathers. They said that all should be counted. We count the convicts who are just as dangerous and just as bad as the Communists or as the Nazis, ***as those aliens here illegally***, and I would not come here and have the temerity to say that the convicts shall be excluded, if the founding fathers say they shall be included. The only way we can exclude them would be to pass a constitutional amendment.

*Id.* (emphasis added).  On this basis, Congress rejected a proposal to exclude "aliens" from the apportionment base.  *See id.*

44.     The Executive Branch, too, has repeatedly recognized—under Presidents of both parties—that the Constitution requires that congressional apportionment take place on the basis of total population, irrespective of citizenship or immigration status.

45.     For example, in 1980, under President Jimmy Carter, private plaintiffs filed a lawsuit in this District seeking to exclude "illegal aliens" from the census and the congressional apportionment base.  *Klutznick*, 486 F. Supp. at 565.  Opposing the suit, the U.S. Department of Justice ("DOJ") told this Court that the plaintiffs "s[ought] a radical revision of the constitutionally mandated system for allocation of Representatives to the States of the Union and

11

an equally radical revision of the historic mission of the decennial census." Federal Defendants'
Post-Argument Mem. at 1, *FAIR v. Klutznick*, No. 79-3269 (D.D.C. filed Feb. 15, 1980).

46.     "[F]or 200 years," the DOJ told this Court, "the decennial census has counted all
residents of the states irrespective of their citizenship or immigration status," and those counts
had been employed in apportionment. *Id.* Given "the clear and unequivocal language of Section
2 of the Fourteenth Amendment," the DOJ urged, the "radical revision" that the plaintiffs sought
could come only from "a constitutional amendment." *Id.* What is more, the DOJ explained,
such a revision would be "patently unfair" to residents of communities in which undocumented
immigrants live, as undocumented immigrants "demand[] precisely the same level of the services
from the municipalities and states in which [they] reside as do all other citizens." *Id.* at 12.

47.     In 1988, under President Ronald Reagan, the Director of the Office of
Management and Budget sought the views of the DOJ on yet another proposal to exclude "illegal
aliens" from congressional apportionment base.  The DOJ concluded that the proposed
legislation was "unconstitutional." Letter from Thomas M. Boyd, Acting Assistant Attorney
General, dated June 29, 1988, at 5.[2]  In the DOJ's view, it was "clear" that, under the Fourteenth
Amendment, "all persons, ***including aliens residing in this country***, [must] be included" in the
congressional apportionment base.  *Id.* at 2 (emphasis added). In fact, the DOJ noted, the
Reconstruction Congress "rejected arguments that representation should be based on people with
permanent ties to the country" and "consciously chose to include aliens." *Id.* at 2-3.

48.     In its 1988 opinion, the DOJ went on to explain that, for apportionment purposes,
the Fourteenth Amendment makes no distinction between "aliens" who are and are not lawfully

---

[2] *Included in* 1990 Census Procedures and Demographic Impact on the State of Michigan: Hearing Before
the Committee on Post Office and Civil Service, House of Representatives, One Hundredth Congress,
Second Session, June 24, 1988 at 240 (United States: U.S. Government Printing Office 1988).

present in the United States. Furthermore, DOJ explained, in analyzing the Fourteenth Amendment, "the Supreme Court . . . has read the word 'person' to include illegal aliens." *Id.* at 3-4 (citing *Plyler v. Doe*, 457 U.S. 202, 210 (1982)).

49.     In 1989, under President George H. W. Bush, the DOJ issued a similar opinion. Once again, a Senator had "requested the views of the Department of Justice concerning the constitutionality of proposed legislation excluding illegal or deportable aliens from the decennial census count." Letter from Carol T. Crawford, Assistant Attorney General, dated Sept. 22, 1989, at 1, 135 Cong. Rec. S12235 (1989). The DOJ responded that "section two of the Fourteenth Amendment which provides for 'counting the whole number of persons in each state' and the original Apportionment and Census Clauses of Article I section two of the Constitution ***require that inhabitants of States who are illegal aliens be included*** in the census count." *Id.* (emphasis added). At that time, current Attorney General William Barr was the head of DOJ's Office of Legal Counsel. In that position, he would be expected to have reviewed and approved the DOJ opinion.

50.     In 2015, under President Barack Obama, the DOJ once again took the position— this time in briefing to the Supreme Court—that Article I, § 2 and the Fourteenth Amendment "were purposely drafted to refer to 'persons,' rather than to voters, and to include people who could not vote"—specifically including "aliens." Brief for the United States as *Amicus Curiae*, *Evenwel v. Abbott*, No. 14-940, at 18 (quoting Cong. Globe, 39th Cong., 1st Sess. 141, 359), 2015 U.S. S. Ct. Briefs LEXIS 3387. In the DOJ's words, this is because "the federal government act[s] in the name of (and thereby represent[s]) all people, whether they [are] voters or not, and whether they [are] citizens or not." *Id.* at 19.

13

51.    The judiciary, too, has long echoed this consensus.  For over fifty years, the U.S. Supreme Court has found it "abundantly clear . . . that in allocating Congressmen the number assigned to each state should be determined solely by the number of the State's inhabitants." *Wesberry v. Sanders*, 376 U.S. 1, 13 (1964).

52.    Just four years ago, the Supreme Court unanimously reaffirmed that the Constitution "select[s] . . . total population as the basis for allocating congressional seats, . . . **whether or not [individuals] qualify as voters**."  *Evenwel*, 136 S. Ct. at 1129.  Because immigration was at the center of the controversy in *Evenwel*,[3] it is beyond question that the Supreme Court had non-citizen immigrants in mind when it made this declaration.

53.    Lower courts, too, have determined that "illegal aliens . . . are clearly 'persons'" for purposes of congressional apportionment, and that "the population base for purposes of apportionment" must therefore "include[] all persons, **including aliens both lawfully and unlawfully within our borders**."  *Klutznick*, 486 F. Supp. at 576 (emphasis added).

54.    To Plaintiffs' knowledge, no court has ever held otherwise.

**C.    In Violation of Statute and the Constitution, The President Has Purported to Exclude Undocumented Immigrants from Congressional Apportionment**

55.    On July 21, 2020, without any advance notice to the public, the President issued a proclamation titled "Memorandum on Excluding Illegal Aliens from the Apportionment Base Following the 2020 Census" (the "Memorandum").[4]   Breaking with almost 250 years of

---

[3] *See, e.g.*, Brief of Eagle Forum as *Amicus Curiae* for Appellants, *Evenwel v. Abbott*, No. 14-940, at 2, 2015 U.S. S. Ct. Briefs LEXIS 2687 (complaining of the "influx of non-citizens in[to] urban areas"); Brief of Immigration Reform Law Institute as *Amicus Curiae* for Appellants, *Evenwel v. Abbott*, No. 14-940, at 1, 2015 U.S. S. Ct. Briefs LEXIS 2724 (complaining of the "harms . . . posed by mass migration to the United States, both lawful and unlawful").

[4] *Available at* https://www.whitehouse.gov/presidential-actions/memorandum-excluding-illegal-aliens-apportionment-base-following-2020-census/ (last accessed July 23, 2020).

precedent, the Memorandum declares that it is now "the policy of the United States to exclude from the [congressional] apportionment base aliens who are not in a lawful immigration status under the Immigration and Nationality Act, as amended (8 U.S.C. 1101 *et seq.*), to the maximum extent feasible . . . ."  Memorandum § 2.

56.     To implement that purported "policy," the Memorandum states that, when the President "transmits . . . to the Congress" his report "regarding the 'whole number of persons in each State'" and the consequent "number of Representatives to be apportioned to each State," he will unilaterally "exclude . . . aliens who are not in a lawful immigration status" from the figures that he transmits.  *Id.* §§ 1, 2.  The Memorandum further asserts that these manipulated figures created at the President's direction, and not the actual "whole number of persons in each State," as provided in the governing statute, shall then "'settle[] the apportionment' of Representatives among the States."  *Id.* § 1.

57.     To enable the President to prepare this manipulated apportionment, the Memorandum orders the Secretary of Commerce to "take all appropriate action . . . to provide information permitting the President . . . to carry out the policy set forth in . . . this memorandum."  *Id.* § 3.  Presumably, this includes providing the President with "data on the number of citizens, non-citizens, and illegal aliens in the country," which the President had earlier commanded the Department of Commerce to collect to permit the President to accomplish this purpose.  *Id.* § 1 (citing Executive Order 13880, July 11, 2019).

58.     The Memorandum makes no serious attempt to square the President's new "policy" with the governing statutory and constitutional provisions described above or with over two centuries of contrary practice.  Instead, the Memorandum purports to justify this "policy" based on the President's own view that "[e]xcluding . . . illegal aliens from the apportionment

base is more consonant with the principles of representative democracy underpinning our system of Government." *Id.* § 2. The Memorandum also relies on the unexceptional premise that transient *visitors* to a State are not included in census numbers to argue that *inhabitants* of a state can be excluded based on their immigration status.

59.     The President is not free to substitute his own personal judgment for those that have already been made by the Congress that enacted 2 U.S.C. § 2a and by the framers and ratifiers of Article I, § 2 and the Fourteenth Amendment. As explained above, the President's duty in preparing and transmitting the apportionment calculations to Congress is purely ministerial. There is no room under the statutory scheme for his exercise of judgment concerning what is most "consonant with the principles of representative democracy." And even if the statutory scheme permitted the President to exercise such judgment, he would of course be restrained by the Constitution's clear command.

**D.     The Memorandum is the Latest in a Series of Unlawful Attempts to Manipulate Apportionment to Deprive Minorities of Political Power**

60.     The Memorandum is not the first time that this Administration has sought to manipulate the census and apportionment process to deprive immigrants and racial and ethnic minorities of political power. To the contrary, it is the latest in an interconnected series of unlawful actions that this Administration has taken for that purpose.

61.     The planning for these actions predated the start of this Administration. In August 2015, the now-deceased Republican redistricting guru Thomas B. Hofeller prepared a secret study for a major Republican donor titled "The Use of Citizen Voting Age Population in

Redistricting" (the "Hofeller Study").[5]  According to the New York Times, Hofeller had already "achieved near-mythic status in the Republican party as the Michelangelo of gerrymandering, the architect of partisan political maps that cemented the party's dominance across the country."[6] The Hofeller Study fortuitously came to light only after he died and his estranged daughter made his personal storage devices available to Plaintiff Common Cause.

62.     In his study, Hofeller concluded that "[a] switch to the use of citizen voting age population as the redistricting population base"—in lieu of total population, as presently used— "would be ***advantageous to Republicans and non-Hispanic whites***" and would dilute the political power of Hispanics.  Hofeller Study at 9 (emphasis added).  The problem, Hofeller explained, was that insufficient information was available to accurately determine the States' citizen voting-age population for purposes of reapportionment.  Without "add[ing] a citizenship question to the 2020 Decennial Census form," he concluded, such a switch would be "functionally unworkable."  *Id.* at 4.

63.     Notably, the Hofeller Study addressed only the possibility of changing the population base for *state*-level redistricting.  This is because Hofeller knew that the Constitution and federal law expressly require use of total population as an apportionment base at the *federal* level.  Even in his most ambitious private scheming, Hofeller did not imagine that the apportionment base for the U.S. Congress could be changed.

64.     When Defendant Trump was elected to the presidency in 2016, Hofeller "urg[ed] [his] transition team to tack the [citizenship] question onto the census."  The transition staffer

---

[5] *Available at* https://www.commoncause.org/wp-content/uploads/2019/05/2015-Hofeller-Study.pdf (last accessed July 23, 2020).

[6] Michael Wines, *Deceased G.O.P. Strategist's Hard Drives Reveal New Details on the Census Citizenship Question*, New York Times, May 30, 2019, *available at* https://www.nytimes.com/2019/05/30/us/census-citizenship-question-hofeller.html (last accessed July 23, 2020).

with whom Hofeller spoke then discussed the issue with Defendant Ross and his advisors several times in the early days of the Administration.  Soon thereafter, Hofeller ghostwrote "the key portion of a draft Justice Department letter" that claimed—falsely, and with no small amount of irony—that "the [citizenship] question was needed to enforce the 1965 Voting Rights Act," a statute intended to protect the political power of racial and ethnic minorities.[7]

65.      The rest is already well-known.  *See generally Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019).  In March 2018, Defendant Ross, in his capacity as Secretary of Commerce, announced his intent "to reinstate a question about citizenship on the 2020 decennial census questionnaire."  *Id.* at 2562.  Ross "stated that he was acting at the request of the [DOJ], which sought improved data about citizen voting-age population for purposes of enforcing the Voting Rights Act . . . ."  *Id.*

66.      Of course, this rationale was pretextual.  The real reason for Ross's decision was that stated by Hofeller in his 2015 study: to provide the data necessary to enable the change in apportionment base from total population to citizen voting-age population, and thereby maximize the political power of "Republicans and non-Hispanic whites."

67.      Shortly after Ross announced his decision, two groups of plaintiffs filed suit to block the citizenship question.  After a bench trial, a federal district court in New York ruled (among other things) "that the Secretary's action was arbitrary and capricious" and "based on a pretextual rationale."  *Id.* at 2564.  The Supreme Court granted certiorari before judgment and affirmed, agreeing with the district court that "the Secretary's decision must be set aside because it rested on a pretextual basis."  *Id.* at 2573.

---

[7] Wines, *Deceased G.O.P. Strategist's Hard Drives Reveal New Details on the Census Citizenship Question*, *supra*.

68.     In particular, the Supreme Court found that "the [Voting Rights Act] played an insignificant role in the decisionmaking process." *Id.* at 2574. Instead, "the Secretary was determined to reinstate a citizenship question from the time he entered office; instructed his staff to make it happen; waited while Commerce officials explored whether another agency would request census-based citizenship data; subsequently contacted the Attorney General himself to ask if DOJ would make the request; and adopted the Voting Rights Act rationale late in the process" as a "distraction" from his true, invidious motive. *Id.* at 2575-76.

69.     On July 5, 2019, just days after the Supreme Court rendered its decision, President Trump admitted what the true reason for the citizenship question had always been. At a press conference, he was asked: "What's the reason . . . for trying to get a citizenship question on the census?" Contrary to what the Administration had maintained in the census litigation, the President answered: "Congress. You need it for Congress, for districting."[8]

70.     With the citizenship question now quashed, however, the Administration sought another way to implement their goal of changing the apportionment base to shift political power to "Republicans and non-Hispanic whites." Thus, on July 11, 2019—six days after his press-conference remarks—the President issued Executive Order 13880, titled "Collecting Information About Citizenship Status in Connection with the Decennial Census." 84 Fed. Reg. 33821.

71.     In that Executive Order, the President recognized that it was now "impossible . . . to include a citizenship question on the 2020 decennial census questionnaire." *Id.* Instead, as a backup plan, the President "determined that it is imperative that all executive departments and agencies . . . provide the [Commerce] Department the maximum assistance permissible . . . in

---

[8] Remarks by President Trump Before Marine One Departure, July 5, 2019, *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-marine-one-departure-51/ (last accessed July 23, 2020).

determining the number of citizens and non-citizens in the country, including by providing any access that the Department may request to administrative records that may be useful in accomplishing that objective." *Id.* To that end, the President "order[ed] all agencies to share information requested by the [Commerce] Department." *Id.* at 33822. He also "direct[ed] the Department to strengthen its efforts . . . to obtain State administrative records concerning citizenship." *Id.*

72.     For the first time, the President specifically called out the importance of "generat[ing] an estimate of the aggregate number of aliens ***unlawfully*** present in each State." *Id.* at 33823 (emphasis added). In addition, the President once again openly acknowledged the true reason why, from the outset, his Administration had been so intently set on collecting citizenship data: not improving enforcement of the Voting Rights Act, but rather, enabling Hofeller's plan to "design . . . legislative districts based on the population of voter-eligible citizens," rather than total population. *Id.* at 33823-24.

73.     There is a clear through-line running through all of the above actions and decisions: from Hofeller's original 2015 plan to change the basis of apportionment, which required new citizenship data; to Ross's decision—at Hofeller's urging—to place a citizenship question on the census, while giving a pretextual reason to mask his true motive; to the President's Executive Order instructing the Commerce Department to collect citizenship data through alternate means; to the President's recent Memorandum purporting to unilaterally shift the basis of congressional apportionment. All of these actions are part of an unconstitutional concerted effort to shift political power away from racial and ethnic minorities, chiefly Latinos, to "Republicans and non-Hispanic whites."

E.      **Plaintiffs' Injuries as a Result of the Challenged Conduct**

74.     The unlawful conduct alleged herein has caused, is causing, and unless enjoined, will cause Plaintiffs to suffer various injuries in fact.

75.     As recognized in the Hofeller Study, removing undocumented immigrants from the apportionment base "alienat[es] Latino voters" and other voters of color, who "perceive [such] a switch . . . as an attempt to diminish their voting strength."  Hofeller Study at 4.  In addition to inflicting alienation, it does, in fact, diminish the voting strength of these groups.  *See id.* at 6-7.

76.     As alleged above, many of the individual Plaintiffs are voters of color, as are many members of the organizational Plaintiffs and many residents of the city Plaintiffs.  These include Latinos, African-Americans, Asian-Americans, and voters of other racial and ethnic backgrounds.  These voters have suffered dignitary harm as a result of Defendants' challenged actions.  They are also certain to suffer diminished voting strength if those actions are not enjoined.

77.     Removing undocumented immigrants from the apportionment base also dilutes the votes and diminishes the representational rights of *citizens*—of all races and ethnicities—who live in jurisdictions with an above-average number of undocumented immigrants.  *See* Hofeller Study at 6.  As the Department of Justice has previously argued, "[i]t would be patently unfair to penalize" these citizens "by depriving them of fair representation in Congress" and diluting their voting strength merely because "a certain number of members of their community are . . . in the class of potentially deportable aliens."  Federal Defendants' Post-Argument Mem. at 12, *FAIR v. Klutznick*, No. 79-3269 (D.D.C. filed Feb. 15, 1980).

78.     Many of the individual Plaintiffs, many members of the organizational Plaintiffs, and many residents of the city Plaintiffs live in areas with an above-average number of undocumented immigrants.  These persons are certain to suffer vote dilution and diminished representational rights if Defendants' challenged actions are not enjoined.

79.     The President has already acknowledged as much.  The Memorandum expressly notes that one state—California—has "more than 2.2 million illegal aliens" and that the exclusion of those undocumented immigrants from the apportionment base could cost California "two or three . . . congressional seats."  Memorandum § 2.  Plaintiffs Common Cause and PANA have members residing in California whose votes would be diluted and who would lose representation under the Memorandum's apportionment regime.

80.     By the same token, the State of New York had approximately 725,000 undocumented immigrants in 2016, a number that has likely increased since then.[9]   If implemented, the Memorandum's apportionment regime would likely result in the loss of one of New York's congressional seats, as each seat in New York presently corresponds to approximately 719,000 people.[10]   As alleged above, a number of the individual Plaintiffs reside in New York, as do many members of Plaintiff Common Cause.  Their votes would be diluted, and they would lose representation, under the Memorandum's apportionment regime.

81.     Similarly, the State of Georgia has approximately 400,000 undocumented immigrants—enough to potentially cost the State one congressional seat if they were not

---

[9]  American Immigration Council, *Fact Sheet: Immigrants in New York*, https://www.american immigrationcouncil.org/research/immigrants-in-new-york (last accessed July 23, 2020).

[10] *2012 – 2020 Federal Representation by People per House Seat, Senate Seat, and Electors*, The Green Papers, https://www.thegreenpapers.com/Census10/FedRep.phtml (last accessed July 23, 2020).

counted.[11]   Plaintiff City of Atlanta is located in Georgia, as are many members of Plaintiff Common Cause.  The votes of their residents and members would be diluted, and they would lose representation, under the Memorandum's apportionment regime.

82.     In addition, as the Department of Justice has recognized, removing undocumented immigrants from the apportionment base "require[s]" residents of areas with an above-average number of undocumented immigrants—including residents who are U.S. citizens—"to assume a greater burden of the cost of state and municipal services" merely because the President has now "determined that a certain percentage of the residents of their community do not exist for purposes of allocation of federal census-based fiscal assistance."  Federal Defendants' Post-Argument Mem. at 12, *FAIR v. Klutznick*, No. 79-3269 (D.D.C. filed Feb. 15, 1980).

83.     Again, many of the individual Plaintiffs, many members of the organizational Plaintiffs, and many residents of the city Plaintiffs live in areas with an above-average number of undocumented immigrants.  These persons are certain to suffer fiscal burdens, including increased costs of state and municipal services, if the challenged actions are not enjoined.

84.     These increased costs would be felt especially acutely by the city Plaintiffs, which must necessarily provide municipal services to citizens, documented immigrants, and undocumented immigrants on an equal basis.  *See, e.g.*, *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 74 (1978) (noting that "police, fire, and health protection" are "basic municipal services" whose delivery to all residents is a "city's responsibility"); *Plyler*, 457 U.S. 202 (holding that the right to a free public education extends to minor undocumented immigrants).

---

[11]   American Immigration Council, *Fact Sheet: Immigrants in Georgia*, https://www. americanimmigrationcouncil.org/research/immigrants-in-georgia (last accessed July 23, 2020).

85.     For example, the State of Georgia reportedly has the seventh-largest number of undocumented immigrants in the United States, many of them concentrated in the city of Atlanta. If undocumented immigrants were removed from the apportionment base, Plaintiff City of Atlanta would have to continue to provide these municipal services to those residents without receiving federal resources and representation commensurate with their numbers.

86.     Plaintiff PANA, moreover, would suffer certain harm to its organizational mission if the challenged actions are not enjoined.  Again, PANA's mission centers around providing support to immigrant communities, including foreign nationals who have resettled and continue to seek refuge in the San Diego region.  Because the San Diego region has a higher-than-average number of undocumented immigrants, removing undocumented immigrants from the apportionment base would reduce the federal resettlement resources directed to that region— resources on which PANA depends to carry out its mission.

87.     Importantly, whatever figures the President transmits to Congress in January 2021, the issuance of the Memorandum is *already* inflicting irreparable injury on Plaintiffs.  The census count is ongoing and is not expected to conclude until the end of October.[12]  At this moment, the Memorandum is causing fear and confusion among the immigrant population and reducing the likelihood that immigrants (both documented and undocumented) will respond to the census survey.[13]  Unless Defendants' actions are declared unlawful and void now, before the

---

[12] *Important Dates*, United States Census 2020, https://2020census.gov/en/important-dates.html (last accessed July 23, 2020).

[13] *See, e.g.*, *Exclusion of undocumented immigrants from the Census is unconstitutional*, El Sol Latino, July 22, 2020, https://elsolnewsmedia.com/jim-kenney-exclusion/ (last accessed July 23, 2020) (reporting statement of the mayor of Philadelphia that the Memorandum "appears targeted to suppress census participation and create fear and confusion among undocumented immigrant communities"); Kendall Ashman, *President's memo to exclude undocumented immigrants from 2020 census apportionment count*, ABC 40/29 News, July 22, 2020, https://www.4029tv.com/article/presidents-memo-to-exclude-undocumented-immigrants-from-2020-census-apportionment-count/33397647# (last accessed July 23,

conclusion of the count, the results of the census—and the consequent impact on congressional apportionment—will be irretrievably altered.  It will be too late to remedy these harms in January 2021, when President is scheduled to transmit the results of the count to Congress.

<u>**COUNT I**</u>
<u>**Violation of U.S. Const., Art. I, § 2, cl. 3 and U.S. Const., amend. XIV, § 2**</u>

88.     Plaintiffs incorporate by reference and reallege all allegations set forth in the preceding paragraphs.

89.     As set forth above, Art. I, § 2, cl. 3, as modified by Section 2 of the Fourteenth Amendment, provides that "Representatives shall be apportioned among the several states according to their respective numbers, counting ***the whole number of persons in each state***, excluding Indians not taxed."  U.S. Const., amend. XIV, § 2.

90.     Since the Founding, all three branches of the federal government have consistently agreed that "the whole number of persons in each state" includes non-citizens, irrespective of their immigration status—and, consequently, that non-citizens must be counted in the census and included in the basis for congressional apportionment.

---

2020) (reporting view of Arkansas immigrant organization that "the president's memo will potentially scare immigrant communities from taking part" in the census count); Alexandra Watts, *Charlotte Reacts to Trump's Proposed Census Changes*, WFAE, July 22, 2020 https://www.wfae.org/post/charlotte-reacts-trumps-proposed-census-changes-0#stream/0 (last accessed July 23, 2020) (reporting that "[m]embers of North Carolina's Latino community say those who are in the country illegally will be even more fearful of filling out the 2020 census after President Trump released [the Memorandum]"); *Trump excluding those in US illegally from reapportionment*, Adirondack Daily Enterprise, July 22, 2020, https://www.adirondackdailyenterprise.com/news/politics/2020/07/trump-excluding-those-in-us-illegally-from-reapportionment/ (last accessed July 23, 2020) (reporting that the Memorandum has "dr[awn] fury and backlash from critics who alleged that it was intended to discourage participation in the [census] survey, not only by people living in the country illegally but also by citizens who fear that participating would expose noncitizen family members to repercussions"); Micah Danney, *SPLC calls Trump census memo unlawful and unconstitutional*, Alabama Reporter, July 22, 2020, https://www.alreporter.com/2020/07/22/splc-calls-trump-census-memo-unlawful-and-unconstitutional/ (last accessed July 23, 2020) (reporting statement of the Southern Poverty Law Center that "the memo will cause widespread confusion and deter people from participating in the census").

91.     By purporting to exclude undocumented immigrants from the basis for congressional apportionment, the President has violated Art. I, § 2, cl. 3 of the U.S. Constitution and Section 2 of the Fourteenth Amendment to the U.S. Constitution.

92.     These violations have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer injury-in-fact as alleged above.

**COUNT II**
**Violation of Equal Protection Clause – Vote Dilution and Representational Injury**

93.     Plaintiffs incorporate by reference and reallege all allegations set forth in the preceding paragraphs.

94.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, made applicable to the federal government via the Due Process Clause of the Fifth Amendment, provides that the government may not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1, cl. 2.

95.     In particular, the Equal Protection clause prohibits the government from taking action in the apportionment process that dilutes or debases the weight of a voter's vote based on the happenstance of where that voter lives.  *See Reynolds v. Sims*, 377 U.S. 533 (1964); *Wesberry v. Sanders*, 376 U.S. 1 (1964).

96.     By purporting to exclude undocumented immigrants from the congressional apportionment base, Defendants have unlawfully diluted Plaintiffs' votes (or the votes of their members and/or residents) by requiring them to live and vote in congressional districts with a population that is higher than an equal proportion of persons as determined by the census and as required by the Constitution.  Similarly, Defendants have caused Plaintiffs (or their members and/or residents) to suffer representational injury by forcing them to compete for their

Representative's limited attention and resources with an artificially high number of fellow-constituents.

97.     These violations have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer injury-in-fact as alleged above.

<u>**COUNT III**</u>
<u>**Violation of Equal Protection Clause – Invidious Discrimination**</u>

98.     Plaintiffs incorporate by reference and reallege all allegations set forth in the preceding paragraphs.

99.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, made applicable to the federal government via the Due Process Clause of the Fifth Amendment, provides that the government may not "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV, § 1, cl. 2.

100.    In particular, the Equal Protection Clause prohibits the government from taking adverse action against any person on the basis of race, ethnicity, or national origin.  *See Flowers v. Mississippi*, 139 S. Ct. 2228 (2019).  This prohibition extends to the apportionment process, and encompasses not only "explicit racial classifications, but also . . . laws neutral on their face but 'unexplainable on grounds other than race.'"  *Miller v. Johnson*, 515 U.S. 900, 905 (1995).

101.    As alleged above, the President's Memorandum is the culmination of a years-long effort to transfer political power *en masse* from voters of color—chiefly, but not exclusively, Latino voters—to "Republicans and non-Hispanic whites."   In other words, the Memorandum, and the policy changes embodied therein, was motivated by intentional invidious discrimination on the basis of race, ethnicity, and/or national origin.

102.    These violations have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer injury-in-fact as alleged above.

<u>**COUNT IV**</u>
<u>**Violation of 2 U.S.C. § 2a and 13 U.S.C. § 141**</u>

103.    Plaintiffs incorporate by reference and reallege all allegations set forth in the preceding paragraphs.

104.    As set forth above, 13 U.S.C. § 141(b) requires the Secretary of Commerce to transmit to the President "the tabulation of ***total population*** by States . . . as required for the apportionment of Representatives in Congress."

105.    Thereafter, 2 U.S.C. § 2a(a) requires the President to transmit to Congress "a statement showing the ***whole number of persons*** in each State . . . as ascertained under the . . . decennial census" and "the number of Representatives to which each State would be entitled" applying the so-called "method of equal proportions" to ***that*** "whole number of persons."

106.    These statutes do not authorize the Secretary of Commerce to transmit to the President any number ***other*** than the "total population by States."  Nor do they authorize the President to transmit to Congress, or to calculate apportionment based on, any number ***other*** than the "whole number of persons in each State . . . as ascertained under the . . . decennial census."

107.    The President's statutory role in this calculating the apportionment figures is purely ministerial and neither calls for, nor permits, the President's exercise of discretion with regard to the proper apportionment basis or the proper underlying theory of democratic representation.

108.    By purporting to require the Secretary of Commerce to transmit to the President population figures concerning or adjusted to exclude undocumented immigrants, and by purporting to exclude undocumented immigrants in the apportionment of congressional representatives, the President has violated 2 U.S.C. § 2a(a) and has commanded the Secretary of Commerce to violate 13 U.S.C. § 141(b).

109.    These violations have caused, are causing, and unless Defendants are enjoined, will continue to cause Plaintiffs to suffer injury-in-fact as alleged above.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for injunctive and declaratory relief as requested above under 42 U.S.C. § 1983 and 28 U.S.C. § 2201(a), and more specifically pray for:

A.    A declaration that the Memorandum, and the other actions challenged herein, are unauthorized by and contrary to the Constitution and laws of the United States, and therefore are null, void, and without force;

B.    A preliminary injunction and permanent injunction halting and restraining Defendants' violations of the U.S. Constitution and laws of the United States alleged herein, by ordering, among other things:

1.    That Defendant Ross, Defendant U.S. Department of Commerce, and their employees and agents (a) not transmit to the President any data regarding citizenship or immigration status; (b) not transmit to the President any census-related data or calculation other than the whole number of persons residing in each State, excluding Indians not taxed; and (c) provide no support or assistance of any kind to the President in carrying out his stated intent to exclude persons from his enumeration and apportionment determinations on the basis of citizenship or immigration status;

2.    That Defendant Trump include all of the inhabitants of each State, excluding Indians not taxed, without respect to such inhabitants' citizenship or immigration status, in the enumeration and apportionment calculations that he prepares and transmits to Congress; and

     3.     That Defendant Johnson neither certify nor transmit to the States any purported apportionment determination by the President that excludes persons from the apportionment base on the basis of their citizenship or immigration status.

     C.     An award of Plaintiffs' reasonable fees, costs, and expenses, including attorney's fees, pursuant to 28 U.S.C. § 2412; and

     D.     Such other and further relief as the Court may deem just and proper.

DATED: July 23, 2020

/s/ *Daniel S. Ruzumna*

Daniel S. Ruzumna  (D.C. Bar No. 450040)

**BONDURANT MIXSON & ELMORE LLP**
EMMET J. BONDURANT*
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA 30309
Telephone: (404) 881-4100
Fax: (404) 881-4111
bondurant@bmelaw.com

**PATTERSON BELKNAP WEBB & TYLER LLP**
GREGORY L. DISKANT*
DANIEL S. RUZUMNA (D.C. Bar No. 450040)
ARON FISCHER*
JONAH M. KNOBLER*
1133 Avenue of the Americas
New York, NY 10036
Telephone: (212) 336-2000
Fax: (212) 336-2222
gldiskant@pbwt.com

*Attorneys for Plaintiffs*
* *pro hac vice* application forthcoming

**McDERMOTT WILL & EMERY**
MICHAEL B. KIMBERLY (D.C. Bar No. 991549)

30

500 North Capitol Street, NW
Washington, D.C. 20001
Telephone: (202) 756-8000
Fax: (202) 756-8087
mkimberly@mwe.com

*Attorney for the Individual and Organizational
Plaintiffs*